UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division
Case No.: 1:23-cv-20495-SEITZ/REID

**CENTER FOR BIOLOGICAL
DIVERSITY, BAT CONSERVATION
INTERNATIONAL, MIAMI BLUE
CHAPTER OF THE NORTH
AMERICAN BUTTERFLY
ASSOCIATION,** and **TROPICAL
AUDUBON SOCIETY**,

       *Plaintiffs,*

v.

**DEBRA HAALAND**, in her official capacity
as Secretary of the U.S. Department of the
Interior, **U.S. DEPARTMENT OF THE
INTERIOR; CHARLES F. SAMS III**, in
his official capacity as Director of the
National Park Service; and **NATIONAL
PARK SERVICE**,

       *Defendants,*

**MIAMI-DADE COUNTY**,
       *Defendant-Intervenor.*

**PLAINTIFFS CENTER FOR BIOLOGICAL DIVERSITY, BAT CONSERVATION
INTERNATIONAL, MIAMI-BLUE CHAPTER OF THE NORTH AMERICAN
BUTTERFLY ASSOCIATION, AND TROPICAL AUDUBON SOCIETY'S
MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM OF LAW IN SUPPORT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

TABLE OF ADMINISTRATIVE RECORD CITATIONS ...................................... vii

MOTION FOR SUMMARY JUDGMENT................................................................ 1

MEMORANDUM OF LAW ....................................................................................... 1

LEGAL FRAMEWORK ............................................................................................. 2

    I.    Endangered Species Act ................................................................................ 2

    II.   National Environmental Policy Act ............................................................. 4

FACTUAL AND PROCEDURAL BACKGROUND............................................... 5

    I.    NPS's Unlawful Amendment of Land-Use Restrictions to Allow Construction of a Waterpark, Retail, Hotel, and Parking Development ......................................... 5

        A.    NPS received a request from Miami-Dade County to amend land-use restrictions for a waterpark, retail, hotel, and parking development. .................................................. 5

        B.    NPS knew its actions would have significant consequences for endangered species and the environment such that ESA and NEPA review were required...................... 6

        C.    NPS unlawfully entered an agreement and executed a release with the County without completing required ESA consultation and NEPA review. .......................... 8

    II.   NPS's 2022 Agreement and 2022 Release have grave consequences for endangered species and environmental resources. ................................................................... 9

STANDARD OF REVIEW ........................................................................................ 10

ARGUMENT ............................................................................................................... 11

    I.    Plaintiffs Have Article III Standing to Bring the Claims in Their Complaint. ................. 11

    II.   NPS Violated the Procedural and Substantive Requirements of the Endangered Species Act When it Failed to Complete ESA Consultation Before Entering the 2022 Agreement and 2022 Release. ........................................................................................ 12

        A.    NPS violated ESA Section 7(a)(2) when it failed to initiate and complete formal consultation. ........................................................................................................ 13

        B.    NPS violated ESA Section 7(d) by irreversibly and irretrievably committing resources when it released land-use restrictions before completing consultation. .. 15

    III.  NPS Violated NEPA When it Failed to Conduct an Environmental Review before Entering the 2022 Agreement and Executing the 2022 Release...................................... 15

REMEDY ..................................................................................................................... 16

    I.    Declaratory Relief ......................................................................................... 16

    II.   Vacatur ........................................................................................................... 17

CONCLUSION............................................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ................................................... 18

*Am. Canoe Ass'n v. White*,
   277 F. Supp. 2d 1244 (N.D. Ala. 2003) .................................... 17

*Am. Great Lakes Ports Ass'n v. Schultz*,
   962 F.3d 510 (D.C. Cir. 2020) .................................................. 18

*Arcia v. Fla. Sec'y of State*,
   772 F.3d 1335 (11th Cir. 2014) ................................................ 11

*Black Warrior River-Keeper, Inc. v. EPA*,
   No. 2:19-cv-00344-JHE,
   2019 U.S. Dist. LEXIS 194615 (N.D. Ala. Nov. 8, 2019) .................. 19

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
   781 F.3d 1271 (11th Cir. 2015) .......................................... 17, 18

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ................................................................. 17

*Ctr. for Biological Diversity v. EPA*,
   861 F.3d 174 (D.C. Cir. 2017) .................................................... 3

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
   No. 19-cv-14199,
   2020 U.S. Dist. LEXIS 252820 (S.D. Fla. Aug. 28, 2020) .............. 3, 11, 13, 14, 17

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*,
   684 F.3d 1242 (11th Cir. 2012) ................................................ 10

*Defs. of Wildlife v. Salazar*,
   877 F. Supp. 2d 1271 (M.D. Fla. 2012) ..................................... 17

*Fla. Key Deer v. Brown*,
   364 F. Supp. 2d 1345 (S.D. Fla. 2005) ...................................... 11

*Fla. Key Deer v. Brown*,
   386 F. Supp. 2d 1281 (S.D. Fla. 2005) ...................................... 15

*Fla. Key Deer v. Paulison*,
   522 F.3d 1133 (11th Cir. 2008) .................................................. 3

*Fla. Key Deer v. Stickney*,
   864 F. Supp. 1222 (S.D. Fla. 1994) ........................... 4, 12, 13, 14, 15, 17, 18, 19, 20

*Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................. 11

*Georgia v. Brooks-LaSure*,
   No. 2:22-CV-6,
   2022 U.S. Dist. LEXIS 149167 (S.D. Ga. Aug. 19, 2022) ...................................................... 20

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) .................................................................................................................. 11

*Hill v. Boy*,
   144 F.3d 1446 (11th Cir. 1998) ................................................................................................ 16

*Indian Riverkeeper v. FHA*,
   No. 05-14005-CIV-MARRA/LYNCH,
   2007 U.S. Dist. LEXIS 113419
   (S.D. Fla. Mar. 21, 2007) ......................................................................................................... 17

*Lane Cnty. Audubon Soc'y v. Jamison*,
   958 F.2d 290 (9th Cir. 1992) .................................................................................................... 15

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................................................................. 11

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) .................................................................................................................... 5

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................................................................... 10

*N. Buckhead Civic Ass'n v. Skinner*,
   903 F.2d 1533 (11th Cir. 1990) ................................................................................................ 10

*Nat. Res. Def. Council v. Houston*,
   146 F.3d 1118 (9th Cir. 1998) .................................................................................................. 15

*Nat'l Parks Conservation Ass'n v. Jewell*,
   62 F. Supp. 3d 7 (D.D.C. 2014) ................................................................................................ 17

*Nat'l Wildlife Fed'n v. Marsh*,
   721 F.2d 767 (11th Cir. 1983) .................................................................................................. 18

*Nat'l Wildlife Fed'n v. Souza*,
   No. 08-14115-CIV,
   2009 U.S. Dist. LEXIS 99674 (S.D. Fla. Oct. 23, 2009) ..................................................... 5, 17

*Nat'l Wildlife Fed'n v. Brownlee*,
   402 F. Supp. 2d 1 (D.D.C. 2005) ................................................................................................ 3

*Pac. Rivers Council v. Thomas*,
   30 F.3d 1050 (9th Cir. 1994) .................................................................................................... 15

*People for the Ethical Treatment of Animals, Inc. v. Dade City's Wild Things, Inc.*,
   No. 8:16-cv-2899-T-36AAS,
   2018 U.S. Dist. LEXIS 219538 (M.D. Fla. Oct. 10, 2018) ...................................................... 12

*Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*,
   87 F.3d 1242 (11th Cir. 1996) .................................................................................................. 11

*Sierra Club v. Babbit*,
  15 F. Supp. 2d 1274 (S.D. Ala. 1998) ..................................................... 16

*Sierra Club v. Flowers*,
  526 F.3d 1353 (11th Cir. 2008) ............................................................ 17

*Sierra Club v. Johnson*,
  436 F.3d 1269 (11th Cir. 2006) ............................................................ 11

*Sierra Club v. Morton*,
  405 U.S. 727 (1972)............................................................................ 11

*Sierra Club v. Strock*,
  495 F. Supp. 2d 1188 (S.D. Fla. 2007) .................................................. 17

*Sierra Club v. Van Antwerp*,
  362 F. App'x 100 (11th Cir. 2010) ........................................................ 17

*Sierra Club, Inc. v. St. Johns River Water Mgmt. Dist.*,
  No. 6:14-cv-1877-Orl-40DAB,
  2015 U.S. Dist. LEXIS 151019 (M.D. Fla. Nov. 6, 2015) ........................ 12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F. Supp. 3d 91 (D.D.C. 2017)........................................................ 20

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978)...................................................................... 2, 19

*Thomas v. Peterson*,
  753 F.2d 754 (9th Cir. 1985) .................................................... 4, 13, 14

*Wilderness Watch v. Mainella*,
  375 F.3d 1085 (11th Cir. 2004) ................................................ 5, 15, 16

**Statutes**

5 U.S.C. § 706..................................................................................... 10, 17

5 U.S.C. § 706(2)(A)............................................................................ 10, 16

16 U.S.C. § 1531(b) .................................................................................... 2

16 U.S.C. § 1533(a)(3)................................................................................. 2

16 U.S.C. § 1533(f)..................................................................................... 2

16 U.S.C. § 1536(a) .................................................................................... 4

16 U.S.C. § 1536(a)(2).................................................................. 2, 3, 13, 14

16 U.S.C. § 1536(b)(3)(A).............................................................................. 4

16 U.S.C. § 1536(b)(4) ............................................................................ 4, 18

16 U.S.C. § 1536(b)(4)(A)............................................................................ 18

16 U.S.C. § 1536(c) ............................................................................... 13, 14

16 U.S.C. § 1536(d) ................................................................................. 4, 15

16 U.S.C. § 1538 ............................................................................................................ 2

42 U.S.C. § 4331 ............................................................................................................ 4

42 U.S.C. § 4332(2)(E) .................................................................................................. 5


**Regulations**

40 C.F.R. § 1501.1(a)(4) ................................................................................................ 5

40 C.F.R. § 1501.3(a) ................................................................................................ 5, 16

40 C.F.R. § 1501.3(a)(2) ................................................................................................ 5

40 C.F.R. § 1501.3(a)(3) ................................................................................................ 5

40 C.F.R. § 1501.4 ......................................................................................................... 5

40 C.F.R. § 1501.5(c)(1) ................................................................................................ 5

50 C.F.R. § 402.02 ................................................................................................ 2, 4, 13

50 C.F.R. § 402.09 ......................................................................................................... 4

50 C.F.R. § 402.12 ....................................................................................................... 14

50 C.F.R. § 402.12(a) .................................................................................................. 13

50 C.F.R. § 402.13 ......................................................................................................... 4

50 C.F.R. § 402.14 ................................................................................................ 3, 4, 18

50 C.F.R. § 402.14(a) .................................................................................................... 3

50 C.F.R. § 402.14(c) .................................................................................................. 14

50 C.F.R. § 402.14(c)(1) ................................................................................................ 3

50 C.F.R. § 402.14(g)(3) ................................................................................................ 3

50 C.F.R. § 402.14(g)(4) ................................................................................................ 3

50 C.F.R. § 402.14(h)(1) ................................................................................................ 4

50 C.F.R. § 402.14(h)(2) ................................................................................................ 4

50 C.F.R. § 402.14(i) ..................................................................................................... 4

50 C.F.R. § 402.16 ......................................................................................................... 4


**Other Authorities**

51 Fed. Reg. 19926 (June 3, 1986) ............................................................................... 3

87 Fed. Reg. 71466 (Nov. 22, 2022) ............................................................................. 9

88 Fed. Reg. 33194 (May 23, 2023) ............................................................................ 13

Fed. R. Civ. P. 56 .......................................................................................................... 1

Fed. R. Civ. P. 56(a) .................................................................................................... 10

## TABLE OF ADMINISTRATIVE RECORD CITATIONS

| Document Title | Date | To | From | Bates Number(s) | Brief Page Number(s) |
|---|---|---|---|---|---|
| 20191025 x Rizo email attach Scan_Barrett, John_12_45_24-09_05_2017 | 1/25/2019 | Rizo, MDC | | NPS00015–NPS00064 | 5 |
| 20200924 x MDC Neira email attach Zoo Miami - Deed Restriction Amendment Area - Revision Proposal Sept 2020_NAN | 9/24/2020 | | Neira, MDC | NPS00219–NPS00222 | 6 |
| 20201005 MDC Neira NPS Barrett email | 10/5/2020 | Barrett, NPS | Neira, MDC | NPS00223–NPS00226 | 6 |
| 20210324 NPS Barrett MDC Salinas-Cotter email Sec 7 confirm_BA outline | 3/24/2021 | Salinas-Cotter, MDC | Barrett, NPS | NPS00227–NPS00228 | 6, 8, 13, 14 |
| 20210324 x 20200813_att table_Service to MD County Rec_early coordination recommendations | 3/24/2021 | | Barrett, NPS | NPS00229–NPS00230 | 9 |
| 20210825 FWS Powell NPS Barrett email | 8/25/2021 | Barrett, NPS | Powell, FWS | NPS00237–NPS00238 | 6 |
| 20210825 x FWS Powell email attachment FWS letter to MDC Salinas-Cotter 7_8_21 | 8/25/2021 | | Powell, FWS | NPS00243–NPS00245 | 7, 14, 18 |
| 20210914 NPS and BCI_Tropical Audubon Society emails | 9/14/2021 | Flanders, BCI | Barrett, NPS | NPS00248–NPS00259 | 6, 7, 14 |
| 20210914 x NPS and BCI_TAS emails attach Bat-Conservation-International-Preliminary-2019-Acoustic-Monitoring-Report | 9/14/2021 | | Flanders, BCI | NPS00261–NPS00268 | 9 |
| 20210914 x NPS and BCI_TAS emails attach Miami Tiger Beetle | 9/14/2021 | | Flanders, BCI | NPS00276 | 9 |
| 20210914 x NPS and BCI_TAS emails attach Miami Wilds Project background information for NPS | 9/14/2021 | | Flanders, BCI | NPS00277–NPS00285 | 7, 9, 18 |
| 20211007 MDC Salinas-Cotter NPS Barrett email Amendment 1 RTD | 10/7/2021 | Barrett, NPS | Salinas-Cotter, MDC | NPS00286 | 20 |
| 20211201 NPS M Hamilton email | 12/1/2021 | Barrett, NPS | Hamilton, NPS | NPS00354–NPS00357 | 6, 14 |
| 20211203 BCI Flanders NPS Barrett email | 12/3/2021 | Barrett, NPS | Flanders, BCI | NPS00366–NPS00367 | 7, 18 |
| 20211214 NPS Barrett Miami Wilds Lambert email assurance letter draft | 2/14/2021 | Lambert, Miami Wilds | Barrett, NPS | NPS00370–NPS00371 | 9 |
| 20211214 NPS M Hamilton email | 12/14/2021 | Barrett, NPS | Hamilton, NPS | NPS00372–NPS00374 | 8, 20 |

| 20211222 Miami Wilds Lambert email assurance letter | 12/22/2021 | Barrett, NPS | Lambert, Miami Wilds | NPS00375– NPS00377 | 9 |
|---|---|---|---|---|---|
| 20211222 x Miami Wilds to MDC assurance letter | 2/22/2021 | | Lambert, Miami Wilds | NPS00378– NPS00379 | 9, 20 |
| 20220105 NPS Barrett MDC Salinas-Cotter email assurance letter follow up | 1/5/2022 | Salinas-Cotter, MDC | Barrett, NPS | NPS00380– NPS00385 | 9, 20 |
| 20220207 NPS Barrett MDC Salinas-Cotter email | 2/7/2022 | Salinas-Cotter, MDC | Barrett, NPS | NPS00390– NPS00391 | 8 |
| 20220208 NPS Barrett BCI FInders email Sec 7 | 2/8/2022 | Flanders, BCI | Barrett, NPS | NPS00392– NPS00394 | 8, 20 |
| 20220629 x Amendment to Release and Transfer of Zoo Deed Restrictions_Executed June 2022 | 6/29/2022 | | Turtletaub, MDC | NPS00396– NPS00453 | 8 |
| 20220629 x Release of Zoo Deed Restrictions_Recorded 06.24.2022 | 6/29/2022 | | Turtletaub, MDC | NPS00454– NPS00460 | 8 |
| 20201130 TAS Ferreira NPS Stabenau email | 11/30/2020 | Stabenau, NPS | Ferreira, TAS | NPS00630– NPS00634 | 6, 18 |
| 20201130 x TAS Ferreira NPS Stabenau email attach | 11/30/2020 | | Ferreira, TAS | NPS00635– NPS00642 | 6, 7, 9, 18 |
| 20210624 BCI Bayless NPS Elrubaie email | 6/24/2021 | Elrubaie, NPS | Bayless, BCI | NPS00648– NPS00649 | 6 |
| 20210624 x BCI Bayless NPS Elrubaie attach Miami Wilds Exhibit B | 6/24/2021 | | Bayless, BCI | NPS00662– NPS00672 | 5, 6, 8 |
| 20210708 NPS Lynch BCI Bayless email | 7/8/2021 | Bayless, BCI | Lynch, NPS | NPS00684– NPS00686 | 6, 7, 8 |
| 20211214 NPS Barrett Miami Wilds Lambert email assurance letter draft attach | 12/14/2021 | | Lambert, Miami Wilds | NPS00687– NPS00690 | 9, 10 |
| 20220614 x NPS Barrett TAS Jonaitis email Zoo Miami attach 1 | 6/14/2022 | | Jonaitis, TAS | NPS00727– NPS00729 | 7 |
| 20220614 x NPS Barrett TAS Jonaitis email Zoo Miami attach 3 | 6/14/2022 | | Jonaitis, TAS | NPS00731– NPS00860 | 6, 9, 10, 16 |

## MOTION FOR SUMMARY JUDGMENT

Plaintiffs Center for Biological Diversity, Bat Conservation International, Miami Blue Chapter of the North American Butterfly Association, and Tropical Audubon Society (Plaintiffs) move this Court to grant summary judgment in their favor. Fed. R. Civ. P. 56. Defendants Deb Haaland, in her official capacity as Secretary of the Department of the Interior; the U.S. Department of the Interior; Charles F. Sams III, in his official capacity as Director of the National Park Service; and the National Park Service (NPS) (collectively, Federal Defendants or NPS) violated the Endangered Species Act (ESA), National Environmental Policy Act (NEPA), and Administrative Procedure Act (APA) by failing to comply with endangered species consultation requirements of the ESA and environmental review requirements of NEPA before entering an agreement with—and executing a release of land-use restrictions to—Miami-Dade County (County) to facilitate development in an environmentally sensitive area that is home to several federally protected endangered species and their critical habitat. Plaintiffs respectfully request that the Court: (1) declare that NPS's failure to complete consultation violates the ESA, NPS's failure to complete required environmental reviews violates NEPA, and as a result, NPS's agreement and release are unlawful; and (2) vacate and set aside the agreement and release.

## MEMORANDUM OF LAW

The Richmond Pine Rocklands in Miami-Dade County constitute the largest remaining fragment of critically endangered pine rockland habitat outside of Everglades National Park. This habitat supports hundreds of rare and endemic species, including the federally endangered Florida bonneted bat, Miami tiger beetle, Bartram's scrub-hairstreak, Florida brickell-bush, Carter's small-flowered flax, deltoid spurge, and tiny polygala, to name a few. For many of the species, this is a last oasis of habitat amidst a sea of urban development, and they cling to survival in the forests and nearby areas. Nightly, Florida bonneted bats fly from their roosts in the forests out over a large, open, dark, quiet parking area to hunt for moths, beetles, and crickets. The last remaining Miami tiger beetles still persist in small patches of sand. And pine rockland plants still find a way—pushing up through cracks in the pavement and sprouting in unkempt areas. The fragment of rocklands and the dark, quiet lot are the closest approximation to the swaths of pine rocklands and open fields that once extended across the county.

But because of an unlawful NPS decision to release land-use restrictions on land in this environmentally sensitive area, the area and all the species who rely on it are now threatened by

a major commercial waterpark, retail, hotel, and parking development. In addition to directly destroying or degrading critical habitat for the Florida bonneted bat and Miami tiger beetle on-site, the development also risks degrading surrounding pine rocklands through pollution, noise, artificial lighting, and prevention of natural fire that the rare ecosystem needs to thrive. Because hundreds of imperiled species rely on pine rocklands for their survival, they too are at risk.

Despite fully knowing its legal obligations, NPS released these lands without undertaking requisite environmental reviews under the ESA and NEPA that are intended to protect endangered species and this environmentally sensitive area. And in doing so, NPS irreversibly committed its resources to this destructive development plan. Because NPS's actions defy reason and violate the ESA, NEPA and the APA, the Court should declare that NPS's actions are unlawful and vacate and set aside NPS' release of land-use restrictions.

**LEGAL FRAMEWORK**

## I.    Endangered Species Act

Congress enacted the ESA in 1973 to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and to establish "a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA, by way of its "language, history, and structure . . . indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities" for protection under the law. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).

Once the U.S. Fish and Wildlife Service (FWS) lists a species as endangered or threatened under the ESA, the species receives an array of procedural and substantive protections that are essential to the species' survival and recovery. *See, e.g.*, 16 U.S.C. § 1538 (prohibiting "take"—*e.g.*, harm, harassment, wounding, or killing—of endangered species); *id.* § 1533(a)(3) (requiring designation of protected "critical habitat" that is essential for the conservation of the species); *id.* § 1533(f) (requiring the creation of detailed recovery plans for listed species).

ESA Section 7 affords those procedural and substantive protections through "consultation," a central provision that requires federal agencies—including NPS—to ensure any actions they authorize, fund, or carry out are not likely to jeopardize the survival and recovery of listed species or result in the destruction or adverse modification of listed species' critical habitat. *Id.* § 1536(a)(2); *see* 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of" and "destruction or adverse modification"). To meet this substantive mandate, the ESA

2

establishes a procedural mandate that NPS must consult with FWS to review and consider the best available science regarding the effects of its actions on species. 50 C.F.R. § 402.14; 16 U.S.C. § 1536(a)(2) (requiring use of the "best available scientific and commercial data").

FWS has adopted regulations that set forth Section 7 consultation procedures. Under the regulations, NPS must initiate consultation with FWS whenever it undertakes an "action" that "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). "The threshold for triggering formal consultation is 'very low' and 'any possible effect . . . triggers formal consultation requirements.'" *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs,* No. 19-cv-14199, 2020 U.S. Dist. LEXIS 252820, at *4–5 (S.D. Fla. Aug. 28, 2020) (quoting 51 Fed. Reg. 19926, 19949 (June 3, 1986) (explaining that "[a]ny possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement")). An agency is relieved of its consultation obligation only if the action will have "no effect" on listed species or designated critical habitat.

The ESA requires NPS to review its actions "at the earliest possible time"—and certainly before committing to or carrying out the agency action—to determine whether the action "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a); *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 189 n. 10 (D.C. Cir. 2017) ("In no uncertain terms, the ESA mandates that every federal agency 'shall' engage in consultation *before* taking 'any action' that could 'jeopardize the continued existence of any endangered species or threatened species.'" (emphasis added)). To fulfill its consultation obligations, NPS must *complete* consultation before taking action. *See* 50 C.F.R. § 402.14(c)(1) (explaining that formal consultation "commences with the [f]ederal agency's written request for consultation . . . and concludes with [FWS's] issuance of the biological opinion"). NPS "may not duck its consultation requirement." *Ctr. for Biological Diversity*, 861 F.3d at 189 n. 10; *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1147 (11th Cir. 2008); *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005).

ESA Section 7 consultation offers effective protection for listed species because of its comprehensive nature. During formal consultation, FWS must "evaluate the effects of the action and cumulative effects on listed species and critical habitat" when added to the "environmental baseline and in light of the status of the species and critical habitat" 50 C.F.R. § 402.14(g)(3)–(4). These effects include "*all consequences* to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the

proposed action," and consequences that "may occur later in time" or "outside the immediate area involved in the action." *Id.* § 402.02 (emphasis added). After this detailed analysis, FWS must issue a biological opinion that: details how the action affects the species, sets forth an opinion regarding whether the action is "likely to jeopardize" listed species or destroy or adversely modify critical habitat, and if so, recommends "reasonable and prudent alternatives" that will not violate the ESA's "no jeopardy" mandate. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(1)–(2). Even where jeopardy is not likely, FWS must specify "reasonable and prudent measures . . . necessary or appropriate to minimize" impacts to species and set forth "terms and conditions" to implement the measures. 16 U.S.C. § 1536(b)(4). When "take" of listed species will occur, FWS must also set a limit on the amount or extent of take that may occur before an agency is required to "reinitiate" consultation. 50 C.F.R. §§ 402.14(i), 402.16.

Compliance with the procedural requirements of ESA Section 7—identifying the likely effects of the action through the consultation process before the action is taken—is integral to compliance with the substantive requirements of the act. *See Fla. Key Deer v. Stickney*, 864 F. Supp. 1222, 1227 (S.D. Fla. 1994) (citing *Thomas v. Peterson,* 753 F.2d 754, 763 (9th Cir. 1985) ("The procedural requirements of [ESA] Section 7(a)(2) . . . are designed to ensure agency compliance with the substantive provisions"). Federal actions that "may affect" listed species or critical habitat may not proceed unless and until the federal agency ensures, through completion of the consultation process, that the action is not likely to cause jeopardy or adverse modification of critical habitat. 16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.13, 402.14.

To that end, the ESA requires that during consultation, action agencies "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" necessary to avoid jeopardizing species. 16 U.S.C. § 1536(d). This prohibition "is in force during the consultation process and continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09.

## II.   National Environmental Policy Act

NEPA declares a national commitment to "fulfill[ing] the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331. NEPA does this by requiring federal agencies to analyze the potential environmental impacts of their decisions and share that information with the public. *Wilderness Watch v. Mainella*, 375 F.3d

1085, 1094 (11th Cir. 2004). "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Nat'l Wildlife Fed'n v. Souza*, No. 08-14115-CIV, 2009 U.S. Dist. LEXIS 99674, at *78 (S.D. Fla. Oct. 23, 2009) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989)) (internal quotation marks omitted). NEPA also requires that all federal agencies study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(E).

To satisfy NEPA, an agency must have taken a "hard look" at the environmental consequences of a project before approving it. *Wilderness Watch*, 375 F.3d at 1094. To that end, NEPA requires one of three types of environmental review. 40 C.F.R. §§ 1501.1(a)(4), 1501.3(a). If the project is likely to have significant effects, the agency must prepare an Environmental Impact Statement (EIS). *Id.* § 1501.3(a)(3). If the project is not likely to have a significant effect, or the significance of the effects is unknown, the agency must prepare an Environmental Assessment (EA) to determine if an EIS is required. *Id.* §§ 1501.3(a)(2), 1501.5(c)(1). If the project fits into a designated category of actions that have been found to normally not have significant effects, and the particular project will not have significant effects, then the agency can approve the project without further environmental review by documenting that a categorical exclusion applies. *Id.* § 1501.4.

## FACTUAL AND PROCEDURAL BACKGROUND

I.  **NPS's Unlawful Amendment of Land-Use Restrictions to Allow Construction of a Waterpark, Retail, Hotel, and Parking Development**

   A.  **NPS received a request from Miami-Dade County to amend land-use restrictions for a waterpark, retail, hotel, and parking development.**

In the 1970s and 80s, NPS conveyed land to Miami-Dade County subject to "deed restrictions [that] required the property to be used for public park and recreational purposes," NPS00670, and further decreed that the property "*shall not* be sold, leased, assigned, or otherwise disposed of except to another eligible governmental agency that . . . can assure the continued use and maintenance of the property for public park or recreational purposes." NPS00020 (emphasis added); *see also* NPS00046; NPS00664; ECF No. 31 at ¶ 2. However, in 2011, "in support of the County's desire to develop the [area]," NPS entered an agreement with the County to release deed restrictions from three parcels of land totaling approximately 67 acres and transfer them to another property. NPS00670; NPS00015–18 (2011 agreement).

Subsequently, the County modified its development plans such that part of the area proposed for development (Project Area) was "still encumbered by the deed restrictions." NPS00670. Thus, the County requested that NPS execute a new "Release and Termination of Restrictions" that would "correspond with the boundary" of the new development proposal. NPS00670; *see also* NPS00684 (NPS "agreed to amend the configuration of the released area to match the project area"); NPS00223 (NPS acknowledging proposal to "revise the footprint . . . to accommodate the future Miami Wilds water park and hotel development"); ECF No. 31 at ¶ 3.

The new development plan, ironically called "Miami Wilds," includes construction and operation of a waterpark, retail, and hotel on 27.5 acres, NPS00664, along with construction and operation of a parking development for a minimum of 4,206 cars and 90 buses, NPS00668–69, covering "approximately 40 acres," NPS00763; NPS00221. The Project Area also includes a 39-acre "option parcel" known as the "Coast Guard Housing Site" that "will eventually be developed as part of the overall project. NPS00644; NPS00669.

### B. NPS knew its actions would have significant consequences for endangered species and the environment such that ESA and NEPA review were required.

NPS knew that the ESA required it to consult with FWS over the effects to endangered and threatened species caused by its decision to release land-use restrictions in the Miami Wilds Project Area. "After consulting with the [Department of the Interior] office of the regional solicitor," NPS "determined that Section 7 consultation with FWS w[ould] be necessary on the Miami Wilds project." NPS00227; NPS00248 ("As you know, we have not executed that amendment with the County as we await submission of the draft biological assessment and the expectation of entering into formal Section 7 consultation with FWS."); NPS00354 (acknowledging that "a Section 7 consultation was to be initiated for a matter at Zoo Miami that involves a development for a theme park known as Miami Wilds"); NPS00357 ("I have what looks to be a Section 7 consultation for one of the parks in my program."); NPS00724–25; NPS00723. Additionally, NPS was in contact with FWS staff, who offered to answer "any questions on the Section 7 process." NPS00237.

Furthermore, as early as 2020, Plaintiffs notified NPS that its action may affect—and indeed was likely to adversely affect—endangered species. *See* NPS00633–42 (explaining that "there is strong scientific evidence that four endangered species depend on this habitat for their survival, including the Florida Bonneted Bat and the Miami Tiger Beetle" and providing a report describing the bat's use of the site); NPS00648 (June 2021 email to Salman Elrubaie at

NPS that the release of land-use restrictions for the development "threatens several federally listed species (including the Florida Bonneted Bat)"); NPS00684–85 (July 2021 email to Joel Lynch at NPS stating the same); NPS00250–54 (August 2021 emails to John Barrett at NPS conveying new Miami tiger beetle observations near the Project Area and Florida bonneted bat acoustic reports concerning the Project Area); NPS00366 (December 2021 email notifying NPS of "recently proposed Miami tiger beetle (MTB) critical habitat"); NPS00726–29 (May 31, 2022 email to John Barrett at NPS highlighting threat to Miami tiger beetle, Florida bonneted bat, and the species' habitat); NPS00277–85 (presentation for NPS outlining threats to Florida bonneted bat, Miami tiger beetle, Bartram's scrub-hairstreak, and Florida leafwing).

FWS also identified significant potential impacts to federally listed species. "Primary concerns" for the endangered Florida bonneted bat include "[l]oss of native vegetation that supports [the bat's] prey"; "[i]ncreased artificial lighting at night"; "[i]ncreased noise levels, particularly at night"; and "[l]oss of foraging area resulting from construction of [p]roject structures [like] tall buildings and water slides[] and associated lighting that would replace the currently large, dark, unobstructed area." NPS00243; *see* NPS00640 (explaining that "[Florida bonneted bat] activity is usually focused in relatively large wide-open spaces, with no vertical obstruction and little to no artificial lighting"). For endangered insects, "[p]rimary concerns" include pesticide use, "[d]irect harm or mortality of Miami tiger beetle[s] and Bartram scrub hairstreak," "[f]ragmentation and loss of Miami tiger beetle and Bartram scrub hairstreak habitat," and the likelihood that "[h]abitat management options (particularly prescribed fire) will be limited due to adjacent development areas." NPS00244.

For endangered plants, including Florida brickell-bush, deltoid spurge, Small's milkpea, Florida pineland crabgrass, tiny polygala, Blodgett's silverbush, sand flax, crenulate lead-plant, and Everglades bully, "[p]rimary concerns" include "[d]irect harm or destruction of threatened and endangered plant species," "loss of native vegetation that supports [threatened and endangered] plants," and the likelihood that "[h]abitat management options (particularly prescribed fire) will be limited due to adjacent development areas." NPS00244. Potential threats to native plants from construction and new development also include direct damage or destruction of vegetation, disturbance of the soil, alteration of site hydrology, introduction of nonnative plant species, improper mowing, and herbicide spray drift. NPS00244.

This information regarding effects to endangered species and environmentally sensitive habitat also put NPS on notice that its prospective action likely had significant environmental effects requiring NEPA review. ECF No. 31 at 4, § 1(b)(i). NPS00227; NPS00684.

**C.     NPS unlawfully entered an agreement and executed a release with the County without completing required ESA consultation and NEPA review.**

Yet on June 23, 2022, NPS entered an agreement (2022 Agreement) with the County to release lands in the Project Area that were subject to land-use restrictions.[1] NPS00396–401; *see* ECF No. 31 at ¶ 4. Pursuant to that agreement, NPS also executed a "Release and Termination of Restrictions" (2022 Release) that "cancels, removes from, terminates, and releases" the revised Project Area "from all of the terms, conditions, covenants, and restrictions . . . including the requirement to maintain the [area] for public park or public recreational purposes." NPS00454–60. NPS did not complete ESA consultation and did not initiate and complete NEPA review before executing the 2022 Agreement and 2022 Release.[2] ECF No. 31 at ¶¶ 6–7.

The 2022 Agreement and 2022 Release were necessary conditions precedent to the County's approval of a lease and development agreement with the developer for the waterpark, retail, hotel, and parking development, which the County and the developer ultimately entered into on June 23, 2022. ECF No. 31 at ¶ 12; NPS00665.

While there is no clear explanation on the record for NPS's flagrant violations of the ESA and NEPA, NPS apparently entered the 2022 Agreement and executed the 2022 Release without completing these legally required reviews to accommodate the developer's interests. NPS00393 ("It is understandable that Miami Wilds would need the proposed project footprint and lease agreement to be in place to commit resources to start the Section 7 work."); NPS00372 (email between NPS staff explaining that the developer "wants to see this project move forward" when discussing whether to allow "this project/land swap to move forward"). Indeed, rather than comply with the clear requirements of the ESA and NEPA, NPS instead accepted an "assurance letter" from the developer to the County that provided bare, unenforceable "commitments" to survey for species and analyze species impacts *only after* NPS had already entered the 2022

---

[1] Although the County finalized the agreement with NPS upon the County's approval on June 23, 2022, NPS signed the agreement February 4, 2022. NPS00400; NPS00457; NPS00391.

[2] It is undisputed that NPS did not prepare an environmental impact statement or an environmental assessment, nor did it document a lawful NEPA exclusion or a "finding of no significant impact." ECF No. 31 at ¶¶ 8–11.

Agreement and executed the 2022 Release. NPS00378–79; NPS00687–88; *see also* NPS00370–71 (developer's email transmitting the letter for NPS approval); NPS00376 (NPS "completed our review and have no substantive comments."); NPS00382 ("The County has reviewed and agrees with the information contained in the letter from Miami Wilds.").

## II.   NPS's 2022 Agreement and 2022 Release have grave consequences for endangered species and environmental resources.

NPS's egregious violations of the ESA and NEPA have serious and extensive consequences for endangered species and sensitive environmental resources these laws were meant to safeguard, as demonstrated by the presence of numerous vulnerable and endangered species. According to FWS, 17 ESA-listed species have been identified as occurring in the Richmond Pine Rocklands, the rare forests the development is proposed to be built amidst. NPS00764 (table); NPS00229–30. The Richmond Pine Rocklands constitute "the largest and most biodiverse fragment of the globally critically endangered Pine Rockland outside the Everglades National Park." NPS00640; *see also* NPS00285.

The open area proposed for development is considered by Florida bonneted bat experts to be "the most important site for recovery and conservation of the Florida bonneted bat in Southeastern Florida" because it "has the highest Florida bonneted bat foraging and social activity within [Miami-Dade] county." NPS00267; NPS00640; NPS00261 (explaining that "the large open area used as a car park at Zoo Miami showed the greatest [bat] activity with an average of over 6,000 calls/night compared to 1,000 calls/night for the next active site"); NPS00263 (noting the bat uses the area "extensively for foraging and social interactions"); NPS00266 (finding, "[b]ased on the roosting availability at Zoo Miami, combined with the large open (car parking) area in front of the zoo, this area provides critical habitat elements for this species' survival"); *see* 87 Fed. Reg. 71466, 71499 (Nov. 22, 2022) (FWS proposal to designate critical habitat for the bat, which includes the Project Area). Studies by Bat Conservation International and Zoo Miami (funded by FWS) "identif[y] the open space as a critical area for Florida bonneted bats." NPS00266–67.

The Richmond Pine Rocklands, and parts of the Project Area, also host the largest population of endangered Miami tiger beetles. NPS00276. And during a survey of a portion of the Project Area, an endangered "Bartram's scrub-hairstreak (a federally endangered butterfly) was documented approximately 150 meters from the eastern perimeter of the project footprint." NPS00775. A survey of portions of the Project Area also revealed "dozens of listed plants . . .

within a few meters of the perimeter of the project footprint," including several pineland croton (*Croton linearis*), which "is not listed as threatened or endangered by any agency but . . . is considered federal Critical Habitat for the Bartram's scrub-hairstreak." NPS00775; NPS00765; NPS00776 (observing that "[l]isted species were fairly common in [areas adjacent to the eastern site of the Project Area], including the federally endangered Bartram's scrub-hairstreak[ and] its hostplant pineland croton").

If NPS had even begun formal consultation or NEPA review, as required by law, it would have undertaken a detailed analysis of the proposed development project and its direct, indirect, and cumulative effects on endangered and threatened species and critical habitat, including considerations of the impacts of habitat destruction, habitat fragmentation, infrastructure, noise, light, water quality, increased predation, and urban growth-inducing effects. AR00231–37 (biological assessment template); *see* NPS00689–90 (maps showing areas of land that would have been included in an ESA consultation). Not only would this analysis have provided the foundation for formal consultation with the expert wildlife agency, FWS, but it would also have put NPS on greater notice regarding the significant environmental impacts of its actions.

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The APA provides the standard of review for NPS's failure to initiate and complete lawful ESA consultation and NEPA review. 5 U.S.C. § 706; *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1248–49 (11th Cir. 2012). Under the APA, an agency's action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Applying this standard, the Court must determine whether "the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990). An agency's decision is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

When a court reviews agency action under the APA, "the court resolves the issues based on the agency's administrative record." *Fla. Key Deer v. Brown*, 364 F. Supp. 2d 1345, 1351 (S.D. Fla. 2005); *Preserve Endangered Areas of Cobb's History, Inc. ("PEACH") v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996).

## ARGUMENT

**I.    Plaintiffs Have Article III Standing to Bring the Claims in Their Complaint.**

To satisfy the Constitution's Article III standing requirements, a party must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The Supreme Court has consistently recognized that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Further, Plaintiffs can sufficiently allege an injury in fact that is procedural in nature if "the procedures in question are designed to protect some threatened concrete interest of [theirs]." *Sierra Club v. Johnson*, 436 F.3d 1269, 1277 (11th Cir. 2006) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n. 8 (1992)); *Ctr. for Biological Diversity*, 2020 U.S. Dist. LEXIS 252820, at *5 (explaining that plaintiffs who alleged federal defendants failed to reinitiate consultation in violation of the ESA had demonstrated a procedural injury sufficient to demonstrate standing).

An organization may raise legal rights on its members' behalf "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted not the relief requested requires the participation of individual members in the lawsuit." *Id.* An organization can also bring an action on its own behalf, independent of its members if it diverted resources sufficient to confer standing. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).

As demonstrated by the five attached declarations, Plaintiffs have standing to bring this action as representatives of their members because their members' aesthetic, scientific,

recreational, professional, and other interests are harmed by NPS's failure to comply with the ESA and NEPA when it entered the 2022 Agreement and executed the 2022 Release. *See generally* Decl. of Barry Knisley, Ph.D. (Ex. 1); Decl. of Shari Blissett-Clark (Ex. 2); Decl. of Dennis Olle (Ex. 3); Decl. of Lauren Jonaitis (Ex. 4); Decl. of Mike Daulton (Ex. 5); *Stickney*, 864 F. Supp. at 1224 (finding the "Plaintiffs and their members derive scientific, recreational, and aesthetic benefit and enjoyment from the existence in the wild of the Key deer" and "that the interests of Plaintiffs and their members would be impaired if the population of the Key Deer continues to decline"); *Sierra Club, Inc. v. St. Johns River Water Mgmt. Dist.*, No. 6:14-cv-1877-Orl-40DAB, 2015 U.S. Dist. LEXIS 151019, at *18 (M.D. Fla. Nov. 6, 2015) (finding plaintiff's "engage in various forms of aesthetic and recreational activities in the region surrounding the [area of the challenged action] such as hiking, camping, and fishing").

Plaintiffs also have standing to bring this action independent of their members because NPS's illegal action has caused concrete and demonstratable injuries to Plaintiff organizations' activities as evidenced by significant diversion of resources. *See generally* Decl. of Mike Daulton (Ex. 5); Decl. of Dennis Olle (Ex. 3); *see People for the Ethical Treatment of Animals, Inc. v. Dade City's Wild Things, Inc.*, No. 8:16-cv-2899-T-36AAS, 2018 U.S. Dist. LEXIS 219538, at *6–7 (M.D. Fla. Oct. 10, 2018) (finding plaintiff had independent standing to challenge zoo's harm and harassment of endangered tigers where plaintiff's exended efforts and expenses on "submitting complaints about [the zoo's] conduct to government agencies in addition to the litigation in this court," and "compiling and publishing information about [the zoo's] history of animal welfare violations").

An order from the Court vacating NPS's 2022 Agreement and 2022 Release and declaring them unlawful because of NPS's ESA and NEPA violations would redress Plaintiffs' injuries.

## II. NPS Violated the Procedural and Substantive Requirements of the Endangered Species Act When it Failed to Complete ESA Consultation Before Entering the 2022 Agreement and 2022 Release.

NPS does not—and cannot—dispute that it violated the ESA and NEPA by failing to complete ESA consultation and NEPA environmental review. Indeed NPS admitted on the record that it violated the ESA and NEPA and stated that "what remains in the litigation is determining what the proper remedy is." Tr. of Status Conference (held June 28, 2023) at 8, lines 22–23; ECF No. 31 at 4–6. A review of the record and applicable law confirms these violations.

**A.     NPS violated ESA Section 7(a)(2) when it failed to initiate and complete formal consultation.**

ESA Section 7 consultation is required whenever an agency contemplates taking an "action," which includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including "directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02. ESA Section 7 contains both procedural and substantive mandates for NPS. *Stickney*, 864 F. Supp. at 1227; *see also Thomas*, 753 F.2d at 763. Procedurally, when determining whether formal consultation is necessary, NPS must prepare a biological assessment to evaluate the potential effects of its proposed action on listed species and critical habitat. 50 C.F.R. § 402.12(a). If "the action 'may affect' a protected species or habitat, formal consultation is required." *Ctr. for Biological Diversity*, 2020 U.S. Dist. LEXIS 252820, at *4–5; 16 U.S.C. § 1536(c). "The procedural requirements of [ESA] Section 7(a)(2) . . . are designed to ensure agency compliance with the substantive provisions" that require NPS to ensure it will not jeopardize species' survival and recovery. *Stickney*, 864 F. Supp. at 1227 (citing *Thomas*, 753 F.2d at 763); 16 U.S.C. § 1536(a)(2).

As demonstrated by NPS's own admissions and the administrative record, NPS failed to conduct requisite ESA consultation with FWS before it entered the 2022 Agreement and executed the 2022 Release. First, as NPS has admitted, the 2022 Agreement and 2022 Release fall within the broad scope of agency actions governed by ESA Section 7 because they are "activities . . . authorized" by NPS. *See* 50 C.F.R. § 402.02 (explaining that examples of agency actions "include, but are not limited to: . . . actions directly or indirectly causing modifications to the land, water, or air"); ECF No. 31 at 5, § 2(b)(1).

Further, as NPS has admitted, the 2022 Agreement and 2022 Release "may affect" ESA-listed species. ECF. No. 31 at 5, § 2(c)(i); *see Ctr. for Biological Diversity*, 2020 U.S. Dist. LEXIS 252820, at *4–5 ("The threshold for triggering formal consultation is 'very low' and 'any possible effect . . . triggers formal consultation requirements.'"). Indeed, the administrative record shows that NPS's actions not only "may affect" but are likely to adversely affect endangered species. NPS acknowledged significant environmental effects, including "potential effects to listed species (most notably the [Florida] bonneted bat, but other species too)." NPS00227. The Miami tiger beetle, one of the rarest species on Earth, with only two known populations, has critical habitat that overlaps with the project site. 88 Fed. Reg. 33194 (May 23, 2023); Decl. of Kara Clauser (Ex. 6) at ¶ 7, Att. A. FWS identified a litany of harmful effects

NPS's action would cause for listed species, including but not limited to destruction and degradation of Florida bonneted bat foraging habitat, direct harm and mortality for Miami tiger beetles and Bartram's scrub-hairstreaks, and the likelihood that vital habitat management like prescribed fire will be limited in nearby pine rocklands due to adjacent development, which would affect all of the species, but especially endangered plants. NPS00243–44.

In view of this overwhelming evidence of prospective effects on listed species and proposed and final critical habitat, NPS has long recognized that it was required to consult with FWS over the effects of its decision on endangered and threatened species and their critical habitat. NPS00227 ("After consulting with the [Department of the Interior] office of the regional solicitor," NPS had "determined that Section 7 consultation with FWS w[ould] be necessary on the Miami Wilds project.") NPS00248; NPS00354; NPS00357; NPS00724–25; NPS00723.

Yet despite clear evidence that its actions not only "may affect" but are *likely to adversely affect* endangered species and critical habitat, NPS did not satisfy the ESA's procedural requirement to complete formal consultation before entering the 2022 Agreement and executing the 2022 Release. ECF No. 31 at 5–6 §§ 2(d)(i), (e)(i). Although there are mentions of the *need to prepare* a biological assessment across the record, *e.g.*, NPS00248, NPS00227, NPS *did not prepare* a biological assessment, nor did it request to initiate formal consultation with FWS. *See Ctr. for Biological Diversity*, 2020 U.S. Dist. LEXIS 252820, at *5–6 ("If the action agency determines, following a Biological Assessment, that the proposed action 'may affect' a species or habitat . . . then the action agency must engage in formal consultation."); 16 U.S.C. § 1536(c); 50 C.F.R. §§ 402.12, 402.14(c). Therefore, FWS violated the procedural requirements of the ESA by failing to initiate and complete formal consultation.

NPS's failures to initiate and complete formal consultation are egregious violations of ESA's procedural requirements which, in turn, constitute violations of the ESA's substantive mandate that NPS must "insure that [its actions are] not likely to jeopardize the continued existence of any endangered . . . or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2). "The procedural requirements of [ESA] Section 7(a)(2) . . . are designed to ensure agency compliance with the substantive provisions." *Stickney*, 864 F. Supp. at 1227 (citing *Thomas*, 753 F.2d at 763 (holding the "[s]trict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the

substantive provisions")); *see also Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998) (explaining that the ESA has "explicit substantive goals which [are] served by its procedural requirements"). "If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result." *Stickney*, 864 F. Supp. at 1227. Thus, because NPS violated ESA Section 7's procedural requirements that ensure compliance with substantive mandate, it has also violated the ESA's substantive mandate, which "is impermissible." *Id.*

 **B.** **NPS violated ESA Section 7(d) by irreversibly and irretrievably committing resources when it released land-use restrictions before completing consultation.**

  ESA Section 7(d) provides that "after initiation of consultation . . . the Federal agency . . . shall not make any irreversible or irretrievable commitment of resources . . . which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). "[S]ection 7(d) clarifies the requirements of section 7(a), ensuring that the status quo will be maintained during the consultation process." *Fla. Key Deer v. Brown*, 386 F. Supp. 2d 1281, 1293–94 (S.D. Fla. 2005).

  Here, NPS failed to maintain the status quo by failing to complete consultation before taking the final agency action to release land-use restrictions via the 2022 Agreement and 2022 Release. Releasing land-use restrictions to facilitate the waterpark and retail development prior to completing consultation constitutes an "irreversible or irretrievable commitment of resources," as it foreclosed the implementation of any recommendations obtained from FWS during the consultation process. *See Nat. Res. Def. Council*, 146 F.3d at 1125 (invalidating all water and irrigation contracts executed prior to completion of the required consultations with the FWS and the NMFS in violation of Section 7(d)); *see also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056 (9th Cir. 1994) (concluding that timber sales constitute per se irreversible and irretrievable commitment of resources); *Lane Cnty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 295 (9th Cir. 1992) (acknowledging same). Accordingly, NPS violated ESA Section 7(d).

**III.** **NPS Violated NEPA When it Failed to Conduct an Environmental Review before Entering the 2022 Agreement and Executing the 2022 Release.**

  To satisfy NEPA, an agency must take a "hard look" at the environmental consequences of a project before approving it. *Wilderness Watch*, 375 F.3d at 1094. Here, NPS did not even give a passing glance. NPS admits the 2022 Agreement and the 2022 Release were major federal

actions under NEPA, and that before it took those actions it did not prepare an EIS, did not prepare an EA, and did not document a finding that a categorical exclusion applied. ECF No. 31 at 2, 4–5; ECF No. 17 at ¶¶ 128, 130, 131, 132, 134. NPS further admits, as it must, that the failure to do any form of NEPA-compliant environmental review for the action violates NEPA and is arbitrary, capricious, and not in accordance with the law. ECF No. 31 at 4; ECF No. 17 at ¶ 134. Indeed, the Administrative Record is devoid of any analysis that would satisfy NEPA.[3] When, as here, the record does not contain evidence that the agency "engaged in significant environmental analysis prior to the decision," then allowing the decision to stand "would significantly undermine the statutory scheme." *Wilderness Watch*, 375 F.3d at 1096. Accordingly, NPS violated NEPA when it executed the 2022 Agreement and 2022 Release without first completing its environmental review.

## REMEDY

Federal Defendants committed serious violations of the ESA and NEPA by failing to complete consultation and undertake environmental review. Therefore, Plaintiffs respectfully request that the Court remedy these violations by: (1) declaring NPS violated the ESA, NEPA, and APA, and as a result, its 2022 Agreement and Release are unlawful; and (2) vacating and setting aside NPS's 2022 Agreement and 2022 Release.

## I.      Declaratory Relief

Plaintiffs respectfully request that the Court declare that: NPS's failure to complete consultation violates the ESA; NPS's failure to review the environmental effects of its actions violates NEPA; and as a result, NPS's 2022 Agreement and 2022 Release are unlawful. Declaratory relief is clearly authorized under the APA to remedy NPS's violations of the ESA and NEPA. *See* 5 U.S.C. § 706(2)(A) (requiring that a "reviewing court shall . . . *hold unlawful* . . . agency action, . . . found to be . . . not in accordance with law" (emphasis added)). Courts regularly grant declaratory relief upon finding violations of the ESA, NEPA, and the APA. *See,*

---

[3] Although the record includes a "Federal Lands to Parks Program Environmental Screening Form," NPS00731–50, it does not relate to the challenged actions before the Court. In any event, the form does not contain analysis sufficient to make the "convincing case" for negligible impacts that would have been required to avoid an EIS and are contrary to law on their face. *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998); *Sierra Club v. Babbit*, 15 F. Supp. 2d 1274, 1283 (S.D. Ala. 1998). A memo-to-file is not a method of NEPA compliance. There are only three pathways for compliance: an EIS, an EA culminating in a FONSI, or a documented categorical exclusion. 40 C.F.R. § 1501.3(a).

*e.g.*, *Stickney*, 864 F. Supp. at 1242 (granting declaratory relief where the Federal Emergency Management Agency failed to consult with FWS in violation of the ESA); *Ctr. for Biological Diversity*, 2020 U.S. Dist. LEXIS 252820, at *41–42; *Nat'l Wildlife Fed'n*, 2009 U.S. Dist. LEXIS 99674, at *94; *see also Indian Riverkeeper v. FHA*, No. 05-14005-CIV-MARRA/ LYNCH, 2007 U.S. Dist. LEXIS 113419, at *14 (S.D. Fla. Mar. 21, 2007) (explaining that "there is a wide range of declaratory relief that the Court may grant in the event the Court finds a NEPA violation"). Thus the Court should grant Plaintiffs' request for declaratory relief.

## II.    Vacatur

Plaintiffs also respectfully request that the Court vacate and set aside NPS's 2022 Agreement and 2022 Release, which the agency executed in violation of the ESA, NEPA, and the APA. "[V]acatur . . . is the ordinary APA remedy" for unlawful agency action. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (quoting *Sierra Club v. Flowers*, 526 F.3d 1353, 1369 (11th Cir. 2008) (Kravitch, J., concurring in part and dissenting in part)) (internal quotation marks omitted); *Sierra Club v. Strock*, 495 F. Supp. 2d 1188, 1203 n. 62 (S.D. Fla. 2007) (describing vacatur as the "undisputed . . . presumptive remedy"). The APA clearly directs that a "reviewing court *shall* . . . hold unlawful and *set aside* agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706 (emphasis added). Therefore, when an agency action violates the law, "the action is deemed invalid and the agency returns to the pre-decision status quo." *Defs. of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1308 (M.D. Fla. 2012) (citing *Flowers*, 526 F.3d at 1369 (Kravitch, J., concurring in relevant part)). Here, and "[i]n all cases[,] agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 413–14 (1971).

Courts regularly vacate agency actions that violate the ESA's consultation requirements and NEPA's environmental review mandates. *See, e.g.*, *Defs. of Wildlife*, 877 F. Supp. 2d at 1309 (setting aside NPS offroad vehicle trail designations where NPS violated NEPA and ESA violations); *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 18, 22 (D.D.C. 2014) (vacating an Office of Surface Mining Reclamation and Enforcement rule where the agency failed to complete ESA consultation regarding the rule's effects on species); *Sierra Club v. Van Antwerp*, 362 F. App'x 100 (11th Cir. 2010) (affirming decision to vacate the issuance of permits based on NEPA violations); *Am. Canoe Ass'n v. White*, 277 F. Supp. 2d 1244 (N.D. Ala. 2003)

(vacating a permit based on a NEPA violation).

In very limited circumstances, "where it is not at all clear the agency's error incurably tainted the agency's decisionmaking process," courts have declined to vacate agency action after balancing the equities. *Black Warrior Riverkeeper*, 781 F.3d at 1290 (citing *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993)); *see also Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (holding remand without vacatur is an "exception[]" to the general rule). This is not one of those limited circumstances. NPS's failure to consult under the ESA, by its very nature, reaches the substance of the agency's decision. *Stickney*, 864 F. Supp. at 1227 (explaining ESA Section 7's intertwined procedural and substantive requirements). As part of ESA consultation, FWS can specify "reasonable and prudent measures" necessary to minimize impacts to listed species and implement them through "terms and conditions" that NPS must comply with when moving forward with the actions. 16 U.S.C. § 1536(b)(4); *see generally* 50 C.F.R. § 402.14 (regulations implementing ESA Section 7(a)(2)). In the event FWS concludes an action will jeopardize a species or destroy or adversely modify critical habitat, NPS must consider "reasonable and prudent alternatives" to the proposed action. 16 U.S.C. § 1536(b)(4)(A). Likewise, environmental review under NEPA includes public comment and an analysis of alternative actions, which could have influenced NPS's decision. 42 U.S.C. § 4332. In view of the overwhelming record evidence that NPS's action will affect endangered species and pine rocklands, NPS00243–44; NPS00277–85; NPS00366; NPS00633–42, ESA consultation and NEPA review likely would have influenced NPS's execution of the 2022 Agreement and 2022 Release. Thus it is clear that NPS's legal violations "incurably tainted" its ultimate decision. *Black Warrior Riverkeeper*, 781 F.3d at 1290.

In any event, here the balance of equities weighs strongly in favor of vacatur. When considering whether an agency action should be vacated, courts consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Black Warrior Riverkeeper*, 781 F.3d at 1290 (quoting *Allied-Signal*, 988 F.2d at 150–51) (internal quotation marks omitted). However, "precedent in this Circuit clearly supports the congressional intent that the balance of the equities should favor an endangered species whenever the Endangered Species Act has been violated." *Stickney*, 864 F. Supp. at 1241 (citing *Nat'l Wildlife Fed'n v. Marsh,* 721 F.2d 767, 786 (11th Cir. 1983)). This court has explained that in

> "the balancing of equities and hardships" involving endangered species, "the order
> of priorities" has been established by Congress to favor endangered species.
> "Congress has spoken in the plainest of words, making it abundantly clear that the
> balance has been struck in favor of affording endangered species the highest of
> priorities, thereby adopting a policy which it described as institutionalized caution."

*Id.* (quoting *Tenn. Valley Auth.*, 437 U.S. at 193–94) (internal citation omitted).

Therefore, the seriousness of NPS's egregious and unexplained legal violations counsels strongly in favor of vacatur, particularly in view of the potential impacts to endangered species. "To consider seriousness, the court must evaluate the extent of doubt as to whether the agency chose correctly." *Black Warrior River-Keeper, Inc. v. EPA*, No. 2:19-cv-00344-JHE, 2019 U.S. Dist. LEXIS 194615, at *6 (N.D. Ala. Nov. 8, 2019). Here, there is considerable doubt where, in the absence of ESA and NEPA review, NPS's actions have serious unconsidered consequences. According to expert bat biologist Dr. Melquisedec Gamba-Rios, the large, dark, open space above the Project Area is important foraging habitat for the largest-known population of Florida bonneted bats, and development of the area would harm their ability to feed by destroying or degrading the foraging habitat with tall structures that obstruct the bats' flight, introducing artificial lights that deter bats and reduce their insect prey, and hampering fire needed to keep the nearby pine rockland forests healthy. Decl. of Melquisedec Gamba-Rios Ph.D. (Ex. 7) at 5–8. These effects would not only harm individual bats but also lead to a decline in a bat population that is so important to the species as a whole that "if this genetically unique population were lost, it could risk the loss of the entire species." *Id.* at 8. According to Dr. Barry Knisley, a leading Miami tiger beetle expert, NPS's actions "risk[] driving the extinction of the species" because "[t]he land National Park Service released restrictions on is home to one of the last two known populations of Miami tiger beetles and overlaps with critical habitat for the species. Considering the species exhibits extreme localization, adverse impacts to one of the two known populations could threaten the very existence of the species." Decl. of Barry Knisley Ph.D. at ¶¶ 11–13. And the Project Area overlaps or is adjacent to pine rocklands and proposed or final critical habitat for at least seven species. Decl. of Kara Clauser at ¶¶ 3–18, Atts. A, D, E, F. Because NPS entirely failed to consider this and other critically important information about the effects of its actions on species and the environment, the seriousness of its violations weighs in favor of vacatur. *Stickney*, 864 F. Supp. at 1241; *see Black Warrior River-Keeper*, 2019 U.S. Dist. LEXIS 194615 at *7 (finding "the seriousness of the [agency's] deficiencies weigh[ed] against remand

without vacatur" where EPA "failed to consider . . . relevant data and information"); *see also Georgia v. Brooks-LaSure*, No. 2:22-CV-6, 2022 U.S. Dist. LEXIS 149167, at *59 (S.D. Ga. Aug. 19, 2022) (holding that a "failure to consider an important aspect of the problem is a 'major shortcoming' generally warranting vacatur").

Although vacatur of the 2022 Agreement and 2022 Release may be disruptive from the County's or the developer's perspective, this factor does not militate against vacatur. The County has indicated that there are no imminent plans to develop the Project Area. Tr. of Status Conference at 12, lines 1–4, 8–9; *id.* at 28, lines 5–7. Therefore, there are no immediate development plans that would be disrupted by vacatur of the 2022 Agreement and Release. Furthermore, having known environmental reviews were required, *see e.g.*, NPS00286 (Miami-Dade email referencing "the [ESA] Section 7 consultation"), and having induced NPS to enter the 2022 Agreement and 2022 Release before completing lawfully required environmental reviews via the "assurance letter," NPS00378–79; NPS00382, the County and developer undertook the risk that the 2022 Agreement and 2022 Release might subsequently be deemed legally invalid and are in no position now to argue that they were harmed by the decision to bypass environmental reviews, NPS00393; NPS00372. *See also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 106 (D.D.C. 2017) ("If projections of financial distress are sufficient to prevent vacatur, the Court fears that agencies and third parties may choose to devote as many resources as early as possible to a challenged project—and then claim disruption in light of such investments."). In view of Congress' intent for the balance to weigh in favor of endangered species, any purported disruptive consequences do not overcome the interest in maintaining the status quo. *See Stickney*, 864 F. Supp. at 1241.

Vacatur of an action undertaken without ESA consultation and NEPA review is critically important because it wipes the slate clean and creates an opportunity for the agency to make a new decision—after consultation with the expert wildlife agency and after NEPA's public notice and comment process and consideration of alternatives—that is properly informed by a full and accurate understanding of the environmental effects of the proposed agency action. Accordingly, NPS's 2022 Agreement and 2022 Release should be vacated and set aside.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to rule in their favor on their motion for summary judgment and to grant their request for declaratory relief and vacatur.

Respectfully submitted this 22nd day of September 2023.


*/s/ Elise Pautler Bennett*
ELISE PAUTLER BENNETT (FL Bar Number: 106573)
ebennett@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33731
Telephone: (727) 755-6950


*/s/ Ragan Edward Whitlock*
Ragan Edward Whitlock (FL Bar Number: 1034177)
rwhitlock@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Telephone: (727) 426-3653


*/s/ Frances Tinney*
Frances Tinney (CA Bar No. 346927*)
ftinney@biologicaldiversity.org
Center for Biological Diversity
1212 Broadway, St. #800
Oakland, CA 94612
Telephone: (509) 432-9256


*\*admitted pro hac vice*

*Attorneys for Plaintiffs Center for Biological Diversity, Bat
Conservation International, Miami Blue Chapter of the
North American Butterfly Association, and Tropical
Audubon Society.*